IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| CHRISTY B. DOWNS, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 5:13cv00083 |
| | ) | |
| v. | ) | |
| | ) | |
| WINCHESTER MEDICAL CENTER, | ) | By: Hon. Michael F. Urbanski |
| et al., | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the court on defendants Valley Health System's and Valley Regional Enterprises, Inc.'s (collectively "Valley Health")[1] motion to for summary judgment. Dkt. No. 79. In this matter, plaintiff Christy B. Downs ("Downs") alleges that Valley Health, her former employer, unlawfully retaliated against her for exercising her rights under the Family Medical and Leave Act, 29 U.S.C. §§ 2601 et seq., ("FMLA"), and discriminated against her in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., ("ADA"). For the reasons stated herein, the court will **GRANT** defendants' motion.

I.

Downs worked at Valley Health for approximately sixteen years. From 1994-1999 she worked as a secretary. In 1999, she transferred to a new office and became the executive secretary (or "executive assistant") to Frank Heisey, the President of Valley Regional Enterprises, Inc. Heisey retired in 2008. He was succeeded by Dena Kent in 2009, and Downs then worked as Kent's executive secretary. However, Heisey temporarily returned to the position when Kent had to take

---

[1] Winchester Medical Center was terminated as a defendant on April 14, 2014.

medical leave due to a cancer diagnosis. Kent returned to work full time in November of 2009. Also in 2009, Downs, at Kent's suggestion, began using FMLA leave due to migraine headaches.

Valley Health paints a picture of Downs as a rather poor employee: frequently late to work, often having unexcused absences (not including her FMLA absences), unable to complete her work in a timely manner, and sometimes making critical errors. Downs, for her part, maintains that she received good performance reviews until Kent grew tired of her increased FLMA usage. As evidence of Kent's animus towards her, Downs points to her allegations that Kent frequently subjected her to demeaning comments about her "never being" at work.

The evidence reflects that Downs did receive "generally exceeds standards" performance evaluation scores in 2009 and 2010. However, these same evaluations, along with Downs' corresponding self-evaluations, noted certain performance issues – namely tardiness and unscheduled absences as well as failing to complete certain tasks in a timely manner. See generally, Kent Dep. Exs., Dkt. No. 87-16, at Ex. 13 (Downs 2009 Self-Evaluation); id. at Ex. 19 (Downs 2010 Performance Evaluation); id. at Ex. 20 (Downs 2010 Self-Evaluation); Exs. to Resp. in Opp'n to Mot. for Summ. J., Dkt. No. 91-1, at Ex. 2 (Downs 2010 Performance Evaluation); id. at Ex. 8 (Down 2009 Performance Evaluation). In fact, after her 2009 evaluation, Heisey placed Downs on a sixty day "action plan" to improve her performance, which was later extended to a ninety day plan. Kent Dep. Exs., Dkt. No. 87-16, at Ex. 11; Downs Dep. Exs., Dkt. No. 87-18, at Ex. 20.

In August of 2010 Kent gave Downs a written "corrective action" for poor attendance. Kent Dep. Exs., Dkt. No. 87-16, at Ex. 22. As a result, Downs was placed on another ninety day "action plan." Kent gave Downs a second "correction action" for poor attendance in February of 2011. Id. at Ex. 24. Downs was then "written up" in April of 2011 for not completing work in a timely manner and missed "punches" on her time card, i.e., tardiness. Down Dep. Exs., Dkt. No. 87-18, at Ex. 35. Around March of 2011, Downs' migraines increased and she consequently

2

increased her usage of FMLA leave. Downs Dep., Dkt. No. 87-17, at 196:24-197:4. In June of 2011, Downs' received another performance evaluation, which reflected a decrease from her performance in 2009 and 2010. She received only a "meets standards" performance evaluation score and Kent wrote that "overall [Downs] has declined in her performance over the last year in almost all aspects of her job." Kent Dep. Exs., Dkt. No. 87-16, at Ex. 25.

The penultimate week of June 2011, Downs emailed Elizabeth Savage-Tracy ("Savage"), the Vice President of Human Resources ("HR"). Downs stated that she felt she was being treated unfairly due to her use of FMLA leave and that a request she had made for annual paid leave ("APL") had been cancelled because of her FMLA usage. Savage-Tracy Aff., Dkt. No. 87-2, at ¶ 9. Savage responded via email on June 28, 2011. Id. at Ex. E. In her email, Savage stated that "the FML[A] [leave] you have taken in the past only plays a role in approval or denial of an APL request to the extent that you deplete your paid leave accruals whenever you take FML[A] [leave] and may not have sufficient APL available to cover vacation"[2] or "because prior FML[A] [leave] delayed projects or work such that additional non-FML[A] APL cannot be justified in order to meet the organization's business needs." Id. Savage stated "[w]e do not punish employees for taking FML[A], however, that leave can affect [sic] non-FML[A] leave requests under the circumstances described above." Id. Ultimately, Savage recommended that Kent conditionally approve Downs' APL request subject to Downs accruing the full amount of APL necessary prior to its start and "getting her work caught up and sustaining her established work standards." Id.; see also id. at ¶ 11.

In August of 2011 Kent began discussing Downs' performance with the HR Department. Kent crafted a document outlining what she believed to be Downs' inadequate job performance entitled "Corrective Action Suspension or Termination???" Kent Dep. Exs., Dkt. No. 87-16, at Ex.

---

[2] The FMLA only guarantees unpaid leave. Thus, an employee who receives pay while on FMLA leave would also be using paid leave, which federal law does not require.

3

33. Significantly, at this time Kent was also communicating with legal counsel about Downs' employment situation by phone and by email. Kent Dep., Dkt. No. 87-15, at 250:17-251:9. However, HR never made a decision on what if any action to take based on Kent's assessment of Downs' performance. Instead, Downs was terminated after she was confronted about unauthorized access of Kent's email.

The events regarding Downs' access of Kent's email began on August 17, 2011. After Kent had been communicating with legal counsel about Downs' possible termination via email, Downs sent a rebuttal of her 2011 evaluation and the two corrective actions from August 2010 and February 2011 to Kent and to the HR Department. See Exs. to Resp. in Opp'n to Mot. for Summ. J., Dkt. No. 91-1, at Ex. 4. In her rebuttal, she asserted that she understood that her job was in jeopardy, but that she had not any "write ups" for sixteen years at Valley Health and that "when FML[A] [leave] is introduced all of a sudden every little thing is being written up and [she] has performance issues which were not present before." Id. She also stated that she and Kent could "make a great team if [they] could get past the harsh feelings [her] being out on FML[A] [leave] has caused." Id.

The next day, Downs spoke with another executive secretary, Patricia Shanholtz. She told Shanholtz that Kent was "talking to an attorney and trying to figure out a way to get rid of her." Shanholtz Aff., Dkt. No. 87-4, at ¶ 14. Shanholtz believed that Downs had acquired this information by reading Kent's email and informed Kent of the conversation. Id. Kent testified that she did not understand how this was possible, as she had recently changed her email password. Kent then contacted Savage. Shanholtz, Kent, and Savage investigated Kent's email settings. They discovered that Downs was also listed as an "owner" of Kent's Microsoft Outlook email account, giving her unrestricted access to Kent's email inbox and all of her emails. Savage-Tracy Aff., Dkt. No. 87-2, at ¶ 12; Shanholtz Aff., Dkt. No. 87-4, at ¶ 15; Kent Dep., Dkt. No. 87-15, at 202:13-

4

203:1. That same day, Valley Health's Information Technology ("IT") Department investigated Downs' email usage and found that she had forwarded emails outside its internal network to her personal email addresses and other non-Valley Health email accounts in violation of Valley Health policy. Savage-Tracy Aff., Dkt. No. 87-2, at ¶ 13; Huffman Aff., Dkt. No. 87-8, at ¶ 6; Kent Dep., Dkt. No. 87-15, at 208:18-209:17.

The following morning, Downs was called into a meeting with Kent, Savage, and Chuck Walton ("Walton"), the HR representative for Valley Regional Enterprises, Inc. Kent Dep., Dkt. No. 87-15, at 215:1-14. At the meeting, Downs freely admitted accessing Kent's email inbox "daily" but claimed it was with Kent's authorization and that it was Kent who, with Downs' assistance, listed Downs as an additional "owner" of her account when she had returned from medical leave in 2009. Kent denied doing this. Id. at 216:3-18; Downs Dep., Dkt. No. 87-17, at 287:2-288:14. Downs and Kent argued, and Walton informed Downs that she was suspended. Downs Dep., Dkt. No. 87-17, at 289:19-290:7.

Downs submitted her resignation that day, Exs. to Resp. in Opp'n to Mot. for Summ. J., Dkt. No. 91-1, at Ex. 5, but Valley Health rejected it by a letter from Savage dated August 23, 2011. See Savage-Tracy Aff., Dkt. No. 87-2, at Ex. F. In relevant part, Downs' termination letter states that Valley Health is "deeply disappointed that you were reading your supervisor's email, acting as her surrogate in Outlook without her knowledge, and forwarding Valley Health information to your multiple personal email address." Id. The letter notes that Kent "disputes that she knew that you had access to her Outlook account," but continues on to say:

> Regardless of how you accessed these emails, as soon as you saw one email related to your own personal personnel situation or from which you would know that your supervisor was not aware that you had this access, you had an ethical and professional obligation to go to her and let her know that you had access to these confidential emails. Your failure to do so is inexcusable and . . . surreptitiously reviewing these emails and forwarding Valley Health information outside of its

5

secure network to your multiple personal email addresses plainly calls
your character into question.

Id.

Downs continues to strongly assert that Kent had given her access to her inbox and that, furthermore, her ability to access to Kent's email inbox was widely known by other Valley Health employees and was in fact essential to her job as Kent's executive secretary. Indeed, she repeatedly made this assertion, at times going into great detail, throughout her deposition. See, e.g., Downs Dep., Dkt. No. 87-17, at 166:4-167:5; id. at 168:17-24; id. at 172:4-9; id. at 172:13-25; id. at 183:23-25; id. at 184:1-6; id. at 233:11-15; id. at 234:8-14; id. at 235:14-20.[3] Valley Health vehemently denies that Kent ever gave Downs access to her email account, an assertion echoed by Kent at her deposition. Kent Dep., Dkt. No. 87-15, at 216:11 ("I did not give [Downs] inbox access ever."); see also id. at 204:8-19; id. at 207:7-15; id. at 229:18-20.

In any event, it is undisputed that Downs was not permitted to access emails in Kent's inbox regarding her own personal personnel situation; it is likewise undisputed that Downs was obligated to inform Kent if she did in fact access such an email. Downs Dep., Dkt. No. 87-17, at 297:4-16.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and

---

[3] Valley Health asserts in its pleadings that Downs "contradicted her claim that Kent knew about the e-mail access, testifying in her deposition, 'I don't know what she knew.'" Am. Br. in Supp. of Summ. J., Dkt. No. 87, at 15 (quoting Downs Dep., Dkt. No. 87-17, at 183:13-14). This assertion does not accurately reflect the testimony, as Downs was responding to the question: "Did [Kent] know you had auto-preview setting on her email?" Downs Dep., Dkt. No. 87-17, at 183:9-10.

6

admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249).

7

The FMLA provides both substantive, i.e., prescriptive rights, along with proscriptive protections against retaliation for the exercise of such rights. Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 546 (4th Cir. 2006). Claims alleging violations of proscriptive FMLA rights are known as "retaliation" or "discrimination" claims. Id. "To succeed on an FMLA retaliation claim, a plaintiff must prove: '(1) that [s]he engaged in protected activity, (2) that the employer took adverse action against [her], and (3) that the adverse action was causally connected to the plaintiff's protected activity.'" Greene v. YRC, Inc., No. CIV.A. MJG-13-0653, 2013 WL 6537742, at *8 (D. Md. Dec. 12, 2013) (quoting Yashenko, 446 F.3d at 551). An FMLA retaliation claim also requires proof retaliatory intent. Bosse v. Baltimore Cnty., 692 F. Supp. 2d 574, 588 (D. Md. 2010) (quoting Stallings v. Hussmann Corp., 447 F.3d 1041, 1051 (8th Cir. 2006)); see also Edusei v. Adventist Healthcare, Inc., No. CIV.A. DKC 13-0157, 2014 WL 3345051, at *5 (D. Md. July 7, 2014) (quoting Bosse, 692 F. Supp. 2d at 588) (same); Ainsworth v. Loudon Cnty. Sch. Bd., 851 F. Supp. 2d 963, 977 (E.D. Va. 2012) (quoting Bosse, 692 F. Supp. 2d at 588) (same). To succeed on her ADA discrimination claim, Downs "must prove that: (1) she was disabled as defined in the ADA; (2) she was a 'qualified individual' for the employment in question; and (3) her employer discharged her or took other adverse employment action against her because of her disability. Shively v. Henry Cnty., Va., No. 4:10-CV-00053, 2011 WL 3799548, at *4 (W.D. Va. Aug. 29, 2011) (citing E.E.O.C. v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir. 2000)).

Both FLMA retaliation claims and ADA discrimination claims are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792. See Perry v. Computer Sciences Corp., 429 F. App'x 218, 219-20 (4th Cir. 2011) (unpublished per curiam opinion) (citing Laber v. Harvey, 438 F.3d 404, 432 (4th Cir. 2006); Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, 53 F.3d 55, 57-58 (4th Cir. 1995)) (holding that the McDonnell Douglas

8

framework applies to ADA discrimination and retaliation claims); Yashenko, 446 F.3d at 551 (holding that the McDonnell Douglas framework applies to FMLA retaliation claims).

> "Under the McDonnell Douglas proof scheme, the plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence." Ennis, 53 F.3d at 58. "If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." Id. "If the defendant meets this burden of production, the presumption created by the prima facie case 'drops out of the picture,' and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination." Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).

Bennett v. Kaiser Permanente, 931 F. Supp. 2d 697, 713-14 (D. Md. 2013).[4]

## III.

Valley Health first argues that Downs' poor performance is a legitimate non-discriminatory reason for her termination. The problem with this argument, Downs counters, is that she was not terminated for poor performance. The court agrees. Poor performance is nowhere mentioned in Downs' termination letter. See Savage-Tracy Aff., Dkt. No. 87-2, at Ex. F. Indeed, elsewhere in its

---

[4] To succeed on an ADA claim a plaintiff must show "but-for" causation. Gross v. FBI Fin. Servs., Inc., 557 U.S. 167, 177 (2009). The Supreme Court's recent decision in University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013), extended the "but-for" causation requirement to Title VII claims. Id. at 2533. Valley Health, relying primarily on Taylor v. Rite Aid Corp., No. CIV. WDQ-12-2858, 2014 WL 320214 (D. Md. Jan. 27, 2014), argues that "but-for" causation should also be applied FMLA claims. However, Taylor applied Nassar to both Title VII and FMLA claims without any analysis or explanation. Id. at *9-10. Moreover, other post-Nassar decisions have expressly declined to extend Nassar to FMLA claims. See, e.g., Kendall v. Walgreen Co., No. A-12-CV-847-AWA, 2014 WL 1513960, at *6 (W.D. Tex. Apr. 16, 2014). Thus, "the question of whether a mixed-motive claim survives in the FMLA context after Nassar is unsettled." Edusei v. Adventist Healthcare, Inc., No. CIV.A. DKC 13-0157, 2014 WL 3345051, at *11 (D. Md. July 7, 2014) (citing Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *8 (M.D.N.C. Mar. 7, 2014)). However, the court need not attempt to resolve this issue because the evidence does not present a genuine dispute of material fact under either the "but-for" standard or the less demanding "mixed-motive" standard.

9

own pleadings Valley Health seems to concede that, while poor performance may have been part of the background for the decision, it was Downs' email usage that prompted her termination. See, e.g., Am. Br. in Supp. of Summ. J., Dkt. No. 87, at 2 ("Downs' conduct violated numerous policies governing the terms and conditions of her employment and resulted in her discharge in short order."); id. at 14 ("Downs' access of Kent's e-mail, her review of Kent's confidential e-mails, her forwarding of Kent's e-mails to her own personal e-mail accounts, and her failure to let Kent know that she had read her confidential e-mails violated multiple policies governing her employment, including those listed above. As a result of these policy violations, Savage decided to terminate Downs' employment."); Reply Br. in Supp. of Summ. J., Dkt. No. 92, at 4 ("Defendants terminated Downs based solely on her knowing failure to comply with their policies, after months of underperforming in her job."); id. at 15 ("Downs' performance was spiraling downward, and she was terminated for a plain violation of Defendants' employment policies, a violation that also resulted in the immediate termination of at least two other employees during the same time frame."); id. at 19 ("Downs violated policy and was terminated").

Downs argues that this case presents a genuine issue of disputed material fact because the parties disagree as to whether Downs had authority to routinely access Kent's email. A jury, she asserts, could reasonably conclude that Valley Health's proffered reason for her termination was a pretext for retaliating against her for her use of FMLA leave and discriminating against her based on her perceived disability. Downs also alleges that pretext may be inferred from the timing of her suspension. In particular, she argues that her August 19 suspension came only two days after she sent an email responding to concerns over her use of FMLA leave. This timing, Downs argues, is suggestive of pretext, and that the real motive for her suspension was retaliation for her exercise of FMLA rights. A close examination of the complete record, however, dispels the notion that either

10

the timing of or the justification given for Downs' termination raises any reasonable inference of pretext.

First, the timing of Downs' termination does not suggestion pretext as she alleges. To be sure, in and of itself, the two day gap between Down's email and her suspension naturally raises some eyebrows. When the complete record is examined, however, no suggestion of pretext is permissible from the timing alone.

In her deposition, Downs admitted that she sent the August 17 email to stave off impending adverse employment actions she learned about by overhearing Kent's conversations with counsel and reviewing Kent's emails.

> Q: This is an August 17th, 2011 email. Do you recall this email?
>
> A: Oh, yeah.
>
> Q: And --
>
> A: Yes.
>
> Q: -- this email was to Dena Kent. And why did you send this to her?
>
> A: Because between overhearing the conversation she had on the speaker phone about me and whatever she was talking about and accidentally seeing what I was supposed to not see, I felt like I hadn't submitted anything in my favor, that this two, three things that she had on me in my file didn't have me saying anything to the contrary. And therefore, if this went somewhere, somebody could say, "Well, you never disputed these things, so if you didn't dispute them, you must have agreed with them."

Downs Dep., Dkt. No. 87-17, at 276:8-24. Thus, the record reveals that Downs' email of August 17 was not so much an assertion of rights under the FMLA, but rather an attempt to use the FMLA to shield herself from impending adverse employment action. If this is suggestive of pretext by anyone, it is not on the part of Valley Health.

Second, the justification given by Valley Health for Downs' termination likewise fails to suggest pretext. To be sure, Downs is quite correct that if her termination was based solely on

11

general unauthorized access to Kent's inbox, there would be a jury question as to pretext and summary judgment would be inappropriate. Plainly, there is dispute of fact as to whether Kent gave Downs routine access to her email, as their testimony is contradictory on that issue. While Valley Health points to evidence that it argues corroborates Kent's version of events, a reasonable jury could find Downs' version more creditable.[5]

However, despite Downs' assertion to the contrary, the evidence clearly shows that she was not terminated merely for generally accessing Kent's inbox. While Downs' termination letter does mention that Kent disputes the fact that she had given Downs access to her inbox, it goes on to state that

> [r]egardless of how you accessed these emails, as soon as you saw one email related to your own personal personnel situation or from which you would know that your supervisor was not aware that you had this access, you had an ethical and professional obligation to go to her and let her know that you had access to these confidential emails.

Savage-Tracy Aff., Dkt. No. 87-2, at Ex. F (emphasis added). This point was re-emphasized in Savage's affidavit. Referring to Downs' claim that she had been granted access to Kent's inbox, Savage averred as follows:

> As I explained to Ms. Downs, even if she was telling the truth – which [Valley Health] did not believe – as soon as she saw one email related to her own personnel situation or from which she would know that [Kent] was not aware that she was reading [Kent's] email, of which there were many, then she had an ethical and professional obligation to bring the matter to [Kent's] attention. I also explained to her that reviewing these emails and forwarding Valley Health information outside of its secure network to her personal email addresses violated multiple policies and also called her character into question. . . . Ms. Downs' egregious breach of [Kent's] trust permitted only one action: her termination.

---

[5] It is worth noting that while Valley Health argues that it is totally implausible that Downs would have access to Kent's inbox, it concedes that another Valley Health secretary has her supervisor's email password. Am. Mem. in Supp. of the Mot. for Summ. J., Dkt. No. 87, at 16; Shanholtz Aff., Dkt. No. 87-4, at ¶ 12.

12

Id. at ¶ 15 (emphasis added). Thus, Valley Health would have terminated Downs' employment even if it were true that she had authority to access Kent's email inbox because she had misused that access to read email related to her own personal employment difficulties.

Critically, Downs conceded at her deposition that she did not have Kent's permission to read emails about herself, and that regardless she read such an email between Kent and legal counsel, printed it, and took a copy of it home.

> Q. And ultimately – you mentioned this earlier – you saw an email between Dena Kent and an attorney for Valley Health discussing you and your job; is that right?
>
> A. I saw an email that I thought was mine because I had sent her an email, and my emails I always do in all caps, the subject line, so I thought it was mine. And what drew my attention to it was the font was a different color. And I thought, "Why would my font change when it goes to Dena?" And that's what drew my attention to the preview pane in the first place. And then when I saw what it was, then I was like, "Oh."
> So yes, I did see that.
>
> Q. And you – you opened it just because you were curious about the font?
>
> A. No. I saw it on the screen because I was curious about the font. When I saw what it said, then I panicked.
>
> Q. And what did you do with that email?
> You can say what you did.
>
> A. I panicked. I printed it out thinking, "Oh, my gosh. What is this? I can't look at this right now because I'm going to have a panic attack and I've got to get this stuff done for the board." And I threw it in my bag and went on about my business.
> I went home that night and read it and just decided that I was not going to remember seeing that email and put it in my personal file.
>
> Q. Did you think you were permitted to take that email?
>
> A. No. I regretted it once I did it, but I panicked. I had a weak human moment of basically, "Oh, crap."

13

> Q. Did taking that email do you believe violate any policies of Valley Health?
>
> A. Apparently, yes, sir.

Downs Dep., Dkt. No. 87-17, at 184:17-186:3. Downs made similar concessions when asked about her termination letter.

> Q. This letter is from Elizabeth Savage-Tracy, vice-president of human resources.
> And I want to ask you, in this second paragraph on the first page, about three-quarters of the way down, she tells you, "regardless of how you accessed these emails, as soon as you saw one email related to your own personal personnel situation or from which you would know that your supervisor was not aware that you had this access, you had an ethical and professional obligation to go to her and let her know that you had access to these confidential emails."
> Do you agree or disagree with that?
>
> A. The way I understood it, Dena knew that I had access to her emails, just like Mr. Heisey knew that I had access to her emails. People sent stuff to them all the time that may or may not have been about me.
> The only time that I accessed something that I should not have, and I knew I shouldn't have, and I panicked and I made a mistake and did it, was the email that I saw that I wasn't supposed to.
>
> Q. Okay. And Ms. Savage-Tracy says, "As soon as you saw one email related to your own personal personnel situation, you had an ethical and professional obligation to go to Dena and let her know you had access."
> Do you agree or disagree with that?
>
> A. Probably, but I panicked.
>
> Q. Do you probably – I'm sorry.
> Do you agree with what she's telling you here, that you had an ethical and professional obligation to go to Dena and let her know what you had seen?
>
> A. Yes.
>
> Q. Is that consistent, that obligation, with the STARS code of ethics, integrity policy and the other policies we looked at?
>
> A. Yes.

14

> But like I said, I panicked. I was scared, and I did the wrong thing. I made a mistake.

Id. at 296:8-297:22. Thus, Downs concedes that she violated Valley Health policy both by accessing an email between Kent and legal counsel about her own personnel situation and by failing to alert Kent after she did so.

Downs counters that Kent testified at her deposition that Downs was not fired for accessing a particular email. See Kent Dep., Dkt. No. 91-2, 239:24-25 ("It was – there was no one email. It was the unauthorized access to the entire inbox."). As an initial matter, it must be noted that while Kent participated in the meeting on August 19, 2011, she did not make the decision to fire Downs. Id. at 224:4-5 ("[T]he decision was made by HR to terminate [Downs]); see also id. at 145: 24-25 (Q: Did -- could you independently fire people? A: No. Oh, absolutely not."). That decision was made by Savage in the HR department. Savage-Tracy Aff., Dkt. No. 87-2, at ¶ 15 ("I made the decision to terminate [] Downs' employment."). Thus, Kent's testimony establishes only her understanding of HR's reasoning.

Moreover, elsewhere in her deposition Kent make clear that Downs' termination was justified even if she had authorized Downs to have full access to her inbox:

> Q: Assuming you had given Ms. Downs permission to access her email --
>
> A: I gave her isolated access when I would call in and say, Can you pull this email. That's very different than access 24/7 to email, in my opinion.
>
> Q: I'm going to go a little broader and ask you to assume that you had given her 24/7 access. Would the conduct that you discovered still have violated the policies that we looked at?
>
> A: Yes, because the minute she saw information that was not -- that she did not need to know, and especially information about her particular situation or discussions with counsel, she should have disclosed that, according to human resource [sic].

Id. at 229:16-230:4.

15

Most importantly, however, the full context of Kent's answer makes clear that she was not denying that the email between her and counsel that Downs accessed did not impact the decision to terminate Downs. Instead, Kent was merely expressing her opinion that the decision to terminate Downs was based on "more than the [i]nternet issues and the inbox," but was also "the cumulative of the corrective actions and the more recent [performance issues] and the integrity policy." Id. at 239:6-12. Kent's assertion that Valley Health had multiple reasons to terminate Downs does not change the fact that Downs has conceded that one of those reasons was valid. To give an extreme example: A hypothetical employee is terminated. He makes a primia facie case of unlawful retaliation and/or discrimination. His employer alleges that it had two legitimate reasons for his termination, (1) that he was often late to work and (2) he embezzled some money. The employee contests that he was often late, but concedes that he embezzled. Such an employee could not defeat summary judgment merely because his employer stated that he was fired for both proffered reasons. The uncontested reason alone is plainly sufficient grounds for the decision and therefore the dispute of fact as to the other proffered justification is not material. Such is the case here.

Plaintiff's counsel also countered at oral argument that Valley Health did not know that Downs read, printed out, and took home the email between Kent and legal counsel at the time of her termination. Specifically, Downs argues Valley Health only knew for certain that Downs had a copy of the email when it was produced back to Valley Health in the course of discovery. This argument misses the mark. While Valley Health concedes that it did not know that Downs had read and taken that particular email when it terminated her, it quite reasonably strongly suspected that she had. Savage averred that the conversation reported by Shanholtz raised suspicion that Downs was reading Kent's email. Savage-Tracy Aff., Dkt. No. 87-2, at ¶ 13. Additionally, Downs submitted a rebuttal to her prior negative performance evaluation from a year prior the day after Kent received

16

an email from counsel about Downs' employment situation. At her deposition, Kent explained why this fact also raised suspicion in her mind:

> [T]hat made me kind of suspicious that she knew somehow that I was talking with legal counsel. And I never put it on my calendar, and the only way she would know that is either through my inbox -- you know, so I just thought it was really unusual that the day after I spoke to the lawyer is when I got her rebuttal the next -- that night is, you know, when that email came.

Kent Dep., Dkt. No. 87-15, at 219:2-8; see also id. at 218:23-25 ("I thought it was really unusual that I was speaking to HR and counsel, and that next day is when [Downs] submitted her rebuttal from a year ago[.]"); id. at 251:2-5 ("I thought[:] How odd is it that I got this after a year and-a-half, soon after I was talking to legal counsel about her situation.").

An employer may validly terminate an employee for a serious violation of company policy even without 100% certainty. Indeed, it is immaterial if "the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Leonard v. Electro-Mech. Corp., No. 1:13CV00029, 2014 WL 1385356, at *7 (W.D. Va. Apr. 9, 2014) (quoting Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000)). Here, Downs has presented no evidence that Valley Health did not genuinely suspect her of intercepting communications between her supervisor (and the company the president) and legal counsel regarding her own personal personnel situation at the time of her termination.[6] Of course, an employer cannot defeat a plaintiff employee's claim at summary judgment by merely noting it had a scintilla of evidence of misconduct at the time it took adverse employment action, even if a later investigation proves that the employee in fact engaged in the suspected misconduct. A jury could reasonably infer pretext based on the lack of evidence the

---

[6] Downs claims that she was prompted to speak with Shanholtz when she overheard Kent talking on the phone about terminating her. Downs Dep., Dkt. No. 87-17, at 232:15-233:3; id. at 294:18-295:8. However, because there is no evidence that either Kent or Savage had any reasons to think that this was how Downs learned that Kent was talking with an attorney, this fact does not negate the reasonableness of their – quite correct – suspicion that Downs had interpreted an email between Kent and legal counsel.

17

employer had at the time.  Here, however, Valley Health had more than sufficient evidence to take action against Downs.  As such, under the particular facts and circumstances of this case, no reasonable juror could conclude that the reason for Downs' termination was pretextual.

Furthermore, it is clear that Valley Health knew that Downs was forwarding emails of Kent's outside of its secure network prior to taking adverse employment action against her.  This is noted in both Downs' termination letter and in the affidavits of Savage and Brian Huffman, a member of Valley Health's IT Department.  Savage-Tracy Aff., Dkt. No. 87-2, at Ex. F; id. at ¶ 13; Huffman Aff., Dkt. No. 87-8, at ¶ 6.  This also violated company policy and further bolsters Valley Health's assertion that it terminated Downs for a legitimate non-discriminatory reason.

Finally, Valley Health has provided evidence that it terminated two other employees for similar conduct.  Specifically, a departmental secretary "knowingly accessed a confidential calendar appointment that fell well outside her right to know." Kagarise Aff., Dkt. No. 92-3, at Ex. A2.[7]  The employee than forwarded the confidential calendar appointed to another employee, who then "accepted" it.  The "accepting" employee then "unsuccessfully attempted to cover up the electronic trial of this breach of confidentiality."  Id.  Both employees were terminated for breach of confidentiality, (although the "accepting" employee was told she would be permitted to re-apply for a job at Valley Health).  Records indicate the "accepting" employee was told that HR could accept her explanation of mistakenly accepting the appointment, but that the "the major issue became the unsuccessful attempt to cover up the electronic trail." Id.

## IV.

Taking all facts in the light most favorable to Downs, and thus assuming that she had authorized access to Kent's inbox, Valley Health has put forward a legitimate non-discriminatory

---

[7] Valley Health uses the same Microsoft Outlook program for both email and electronic calendaring purposes.

18

reason for her termination: accessing confidential emails in Kent's inbox between Kent and legal counsel about her own personnel situation.[8] Downs has conceded that her actions violated Valley Health policy even assuming she generally had access to Kent's inbox and Valley Health has put forwarded evidence that other employees were terminated for similar misuse of Outlook access.[9] Furthermore, the timing of Downs' termination fails to provide any evidence of pretext. As such, Downs has failed to put forward sufficient evidence that the reason for her termination was pretextual such that a reasonable jury could find in her favor.

For the foregoing reasons, the court will grant Valley Health's motion for summary judgment by an appropriate Order entered this day.

The clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered: August 18, 2014

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

---

[8] At oral argument, Downs argued that her access of the email was a legitimate form of self-help in gathering evidence of her employer's misconduct. Even assuming such a self-help right exists, intercepting attorney-client communications is clearly well outside its scope.

[9] Indeed, Downs herself acknowledged that she thought that she could be terminated for simply accessing this email – let alone doing so and then failing to inform Kent or HR – although she immediately attempted to backtrack on that concession. See Downs Dep., Dkt. No. 87-17, at 282:7-21.